Ingrid NEWKIRK, et al., Plaintiffs,

v.

Paul SHEERS, et al., Defendants.

Civ. A. No. 92–CV–4237.

United States District Court,
E.D. Pennsylvania.

Sept. 16, 1993.

Steve D. Shadowen, Gordon A. Einhorn, Schnader, Harrison, Segal & Lewis, Harrisburg, PA, for plaintiffs.

David L. Schwalm, Thomas, Thomas & Hafer, Harrisburg, PA, for defendants.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

This 42 U.S.C. § 1983 action is brought by nine plaintiffs,[1] against local government defendants in their official and individual capacities.[2] The plaintiffs instituted this civil rights action by filing a Complaint on July 22; 1992. Following the filing of a Motion to Dismiss by defendants, plaintiffs filed an Amended Complaint on October 6, 1992. On November 13, 1992, Defendants filed their

Answer to the plaintiffs' Amended Complaint.

After completing discovery, the parties reached an agreement and stipulated to the dismissal of various claims. In the parties' court approved Stipulation filed on August 3, 1993, plaintiffs agreed to dismiss with prejudice Counts II, IV, VII, VIII, IX and X of the Amended Complaint. The parties also decided to dismiss with prejudice Count I of plaintiffs' Amended Complaint except for the claims relating to plaintiffs sleeping on mattresses on the floor of single inmate cells. Finally, the parties were able to reach a tentative agreement with respect to Count XI of the Amended Complaint.

Accordingly, based upon the Stipulation of the parties, the only remaining claims to be resolved by this court are the claims in Count I relating to plaintiffs sleeping on mattresses on cell floors, Count III relating to restrictions on plaintiffs' use of the telephone during a 48–hour "lockdown" period immediately following their arrest, and Counts V and VI relating to plaintiffs' claims regarding the strip search procedures adopted and followed at the Schuylkill County Prison. With respect to these claims, the parties have entered into a Stipulated Statement of Facts.

Before the court now are the parties' cross summary judgment motions, which were both filed on August 3, 1993. Both parties maintain in their briefs that there are no outstanding material issues of fact. Based upon the parties' Stipulated Statement of Facts and for the reasons that follow, we will grant plaintiffs' motion in part and deny it in

---

1. Ingrid Newkirk, Laura Yanne, Robin Lord, Heidi Prescott, Robin Walker, Sue Brebner, Teresa Gibbs, Jenny Woods, and Dana Forbes. In the parties' Stipulation filed on August 3, 1993, the claims of plaintiff Ann Koons were discontinued.

2. Defendants include: Paul Sheers, Franklin L. Shollenberger, Mary Ann Conway, the current County Commissioners of Schuylkill County; the Honorable Joseph F. McCloskey, Claude Shields, Timothy Holden, and Donald Kerns, members of the Schuylkill County Prison Board; Louis Wallaver, the Schuylkill County Court Administrator; David Kurtz, Warden of the Schuylkill County

Prison; Raymond Lorent, Deputy Warden of the Schuylkill County Prison; Elmer Cutler, John Kling, and William Nasados, supervisors at the Schuylkill County Prison; Hilda Laubach, Sandy Medinsky, Linda Neidig, Bernadine DeAngelo, Patricia Heckman, Barbara Schwartz, and Carol A. Mickalowski, corrections officers at the Schuylkill County Prison; and Kathleen Shartzer, former corrections officer at the Schuylkill County Prison. The claims against defendant Mary Ann Conway in her individual capacity were dismissed pursuant to the parties' Stipulation filed on August 3, 1993.

part and grant defendants' motion in part and deny it in part.

## I. *SUMMARY JUDGMENT STANDARD*

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 106 S.Ct. at 2510. All inferences must be drawn and all doubts resolved in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On motion for summary judgment, the moving party bears the initial burden of identifying for the court those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 106 S.Ct. at 2552 n. 3 (quoting Fed.R.Civ.P. 56(e)); *see First Nat. Bank v. Lincoln Nat. Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11.

## II. *STIPULATED FACTS*

The parties to this case filed a Stipulated Statement of Facts on August 3, 1993.

These Stipulated Facts are set forth in their entirety and may be summarized as follows.

Plaintiffs were arrested on September 2, 1991, in connection with a non-violent civil disobedience protest at the Hegins Pigeon Shoot, an annual event held each Labor Day weekend since 1934 in Hegins, Pennsylvania. Statement of Stipulated Facts ["Stip.Facts"], ¶¶ 1, 2. Pigeons are placed in boxes from which they are catapulted in the air and then shot by contestants. Stip.Facts, ¶ 1. Plaintiffs were arrested after going onto the shooting field in order to release pigeons from their boxes and to rescue wounded pigeons that had fallen to the ground. Stip. Facts, ¶ 13. All of the plaintiffs were charged with criminal trespass; plaintiffs Prescott and Woods were also charged with theft and receiving stolen property.[3] Stip. Facts, ¶¶ 15, 16.

Following the arrests, plaintiffs were taken before a District Justice, who ordered those plaintiffs refusing to post bail incarcerated as pretrial detainees in the Schuylkill County Prison.[4] Stip.Facts ¶ 17. Seven of the plaintiffs remained in the prison from September 2, 1991 until September 16, 1991, at which time they entered guilty pleas, were fined and/or sentenced to time served and released. Stip.Facts, ¶ 18.

During plaintiffs' detention, they were subjected to various conditions that they allege violated their constitutional rights, including (1) being subjected to strip and body cavity searches pursuant to a blanket strip search policy implemented by Schuylkill County, Stip. Facts, ¶¶ 20–36, (2) being required to double-up in cells designed for one inmate and being forced to sleep on mattresses on cell floors, Stip.Facts, ¶¶ 37–55, and (3) having restricted access to telephones during an initial 48–hour "lockdown" period, Stip.Facts ¶¶ 56–68.

The parties have stipulated that we should base our decision upon the following facts:

1. For 60 years the town of Hegins, Pennsylvania, has hosted an annual contest

---

3. In each of the theft offenses, the items involved were the pigeons the animal rights protestors were attempting to rescue. Stip.Fact ¶ 16.

4. Plaintiffs Laura Yanne and Robin Lord posted bail and were released from prison on September 3, 1991. Stip.Facts, ¶¶ 18, 19.

shoot of live pigeons on Labor Day. Plaintiffs oppose the pigeon shoot for the following reasons:

Each year the shooters kill or injure more than 6,000 pigeons. The birds are placed inside small boxes ("traps") from which they are catapulted. They are then shot by the contestants. Many of the birds are killed outright; the wounded ones are picked up by town children, known as "trapper boys," who twist off the birds' heads or stomp them to death.

Defendants are not responsible for the pigeon shoot and have not participated in the pigeon shoot and are therefore not able to stipulate to the accuracy of the Plaintiffs' reasons.

2. The Plaintiffs, all of whom were arrested during a protest at the 1991 Hegins Pigeon Shoot, are Ingrid Newkirk, age 43, Laura Yanne, age 38, Robin Lord, age 41, Heidi Prescott, age 35, Robin Walker, age 27, Sue Brebner, age 42, Teresa Gibbs, age 30, Jenny Woods, age 31 and Dana Forbes, age 38.

3. Plaintiffs were aware that a confrontation could occur during which they could be arrested. Some of the Plaintiffs had previously been arrested and pled guilty to similar charges during similar animal rights protests.

4. Defendants Paul Sheers, Franklin L. Shollenberger and Mary Ann Conway are the current County Commissioners of Schuylkill County. Mary Ann Conway was not a County Commissioner during the period of the Plaintiffs' imprisonment and was sworn into office on January 6, 1992. She was not responsible for any prison policy making decisions prior to that time.

5. Defendants the Honorable Joseph F. McCloskey, Claude Shields, Timothy Holden, and Donald Kerns are members of the Schuylkill County Prison Board. Louis Wallaver was the Court Administrator but not a member of the Prison Board.

6. Defendant David Kurtz is Warden of the Schuylkill County Prison.

7. Defendant Raymond Lorent is Deputy Warden of Schuylkill County Prison. Deputy Warden Lorent served as acting Warden during a portion of the period from September 2, to September 16, 1991, when Warden Kurtz was absent from Schuylkill County Prison.

8. Defendants Elmer Cutler, John Kling, and William Nasados are supervisors at the Schuylkill County Prison. They were not involved in any policy making decisions with respect to the Schuylkill County Prison.

9. Defendants Hilda Laubach, Sandy Medinsky, Linda Neidig, Bernadine DeAngelo, Patricia Heckman, Barbara Schwartz, and Carol A. Mickalowski are corrections officers at the Schuylkill County Prison and held those positions in September of 1991. Defendant Kathleen Shartzer was a corrections officer at the Schuylkill County Prison in September of 1991. They were not involved in any policy making decisions with respect to the Schuylkill County Prison.

10. Defendant DeAngelo has been a certified corrections officer since 1985.

11. Defendant Neidig has been a certified corrections officer since 1985.

12. Plaintiffs were arrested on various summary offense or misdemeanor charges on September 2, 1991, during their participation in a civil disobedience protest at the annual pigeon shoot in Hegins, Pennsylvania.

13. Plaintiffs were arrested after going onto the shooting field in order to release pigeons from their boxes and to rescue wounded pigeons laying on the ground.

14. Plaintiffs were all charged with criminal trespass as either a summary offense or misdemeanor.

15. The citation for criminal trespass issued to Plaintiff Lord stated that, in part, the nature of the charge against her was carrying the American flag without privilege to do so.

16. Plaintiffs Prescott and Woods were also charged with theft and receiving stolen property. The property involved in both offenses was the pigeons that they were attempting to rescue.

17. Following their arrests, each of the Plaintiffs was taken before a district justice at which time bail was set. Failing to post

bail, each Plaintiff was then incarcerated as a pretrial detainee in the Schuylkill County Prison. Some of the Plaintiffs chose not to post bail as part of their protest against the pigeon shoot.

18. Plaintiffs Ingrid Newkirk, Heidi Prescott, Robin Walker, Sue Brebner, Teresa Gibbs, Jenny Woods and Dana Forbes remained in the Prison from September 2, 1991, until September 16, 1991, at which time they entered guilty pleas, were fined and/or sentenced to time served, · and released. Plaintiff Laura Yanne posted bail and was released from prison on September 3, 1991, and subsequently entered a guilty plea.

19. Plaintiff Robin Lord was released on bail on September 3, 1991. The charges against her were eventually dismissed.

### Strip and Visual Body Cavity Searches

20. Upon their arrival at the Prison on September 2, 1991, between the hours of 5:30 p.m. and 9:15 p.m., each Plaintiff was subjected to a "pat" search followed by a strip and visual body cavity search performed by a female corrections officer. This search was performed as part of the admission process that included obtaining medical information, photographing, fingerprinting and providing each Plaintiff with prison clothes.

21. Each Plaintiff was taken by a female corrections officer into the Prison Property Room, instructed to remove all her clothing, and ordered to turn her back to the corrections officer, bend over at the waist, and spread her buttocks.

22. The strip and visual body cavity searches of Plaintiffs Newkirk, Brebner, Gibbs, Lord, Prescott, Walker and Woods were conducted by corrections officer Bernadine DeAngelo. The strip and visual body cavity searches of Dana Forbes and Laura Yanne were conducted by either corrections officer Linda Neidig or corrections officer Bernadine DeAngelo. Neidig performed at least one of those searches.

23. The strip and visual body cavity searches were performed pursuant to the officially adopted policy of Schuylkill County requiring that all individuals admitted as prisoners into Schuylkill County Prison, including pretrial detainees, undergo strip and visual body cavity searches. Pursuant to this policy, all pretrial detainees undergo this search without regard to the offense with which they have been charged, their prior record, or any specific suspicion of concealment of contraband.

24. This strip search policy is set forth in the Policy and Procedures Manual of the Schuylkill County Prison. This manual was revised by Warden Kurtz. The policy also appears in the Rules and Regulations handbook of the Schuylkill County Prison. The handbook was written by Warden Kurtz. Both of these documents were approved by the Schuylkill County Prison Board and the Pennsylvania Department of Corrections.

25. The Schuylkill County Prison Rules and Regulations provide:

D. You will undergo search procedures as follows:

1. Full search of all clothing and personal articles—including dismantling if necessary.

2. Full body (strip) search of your person for the purpose of locating contraband, identifying injuries, and marks of identification.

26. The strip searches were also conducted in reliance upon 37 Pa.Code § 95.-222(b)(1), which provides:

The following are the recommended guidelines concerning the admission process:

Each prisoner admitted shall be stripped and searched for weapons and contraband. The search should also include a check for body vermin, and for cuts, bruises, needle scars, and other injuries. The strip search should be conducted in a professional non-humiliating manner, and for security and privacy reasons, the search should be conducted in an area where the prisoner is in view of only those officers in charge of the search.

27. The purpose of the strip search is to search for weapons, contraband and check for any injuries or marks on the body.

28. The searches of the Plaintiffs were conducted solely on the basis of Prison policy and were not based upon any specific suspi-

cion that any of the Plaintiffs was concealing weapons, drugs, or other contraband.

29. Plaintiffs were given copies of the Rules and Regulations handbook upon their arrival at the Prison.

30. None of the Plaintiffs has ever been arrested for offenses involving weapons or drugs.

31. At the time Plaintiffs were processed into the Prison, Defendants did not know whether or not Plaintiffs had prior criminal records.

32. Prior to September 2, 1991, inmates had attempted to smuggle contraband into the Schuylkill County Prison in body cavities on several occasions.

33. Pursuant to prison policy, Plaintiffs Woods, Forbes, Prescott, Brebner, Newkirk, and Gibbs underwent a second strip search when they returned from their court hearings of September 16, 1991. These searches were performed by Defendant Barbara Schwartz.

34. None of the Plaintiffs were physically touched during the strip searches that were carried out.

35. Defendants Neidig and DeAngelo acknowledge that they know there is a difference in legal status between convicted prisoners and pretrial detainees.

36. During the search of Plaintiff Prescott on September 2, 1991, corrections officer DeAngelo ordered her to remove her tampon and to place the soiled tampon in a bag held by DeAngelo.

### Mattresses on the Floor

37. Each of the Plaintiffs was housed in Cell Block A, the women's cell block at Schuylkill County Prison.

38. Cell Block A contains 12 cells, each of which has one bed.

39. The inmate population of Cell Block A on the night of September 2, 1991, was 26 inmates.

40. Between September 3 and September 16, 1991, the inmate population of Cell Block A ranged from 16 to 22 persons.

41. During their detention, all but two of the Plaintiffs were at some time required to sleep on Prison mattresses placed on the floor. These mattresses are six feet long by three feet wide and four inches thick. On the night of September 2, 1991, the mattresses were placed either on the floor of the single-occupant cells or on the floor of the Day Room of the Cell Block. Subsequent to September 2, all mattresses were placed in cells.

42. The need for use of mattresses existed because of the unanticipated influx of female inmates on September 2, 1991. During prior years, the prison had not received pretrial detainees as a result of any protest of the Hegins Pigeon Shoot.

43. Plaintiff Newkirk spent 1 night on a mattress on the floor in the Day Room and 13 nights on a mattress on the floor in a cell; Plaintiff Gibbs spent 14 nights on a mattress on a cell floor; Plaintiff Woods spent 14 nights on a mattress on a cell floor; Plaintiff Forbes spent 1 night on a mattress on the floor in the common area and thereafter in a cell bed; Plaintiff Yanne spent 1 night on a mattress on the floor in the common area and was released the following day; Plaintiff Walker spent approximately 6 nights on a mattress on the cell floor and thereafter in a cell bed; Plaintiff Brebner spent approximately 6 nights in a cell bed followed by approximately 8 nights on a mattress on a cell floor.

44. Plaintiffs who slept on mattresses placed on the cell floors had a choice of sleeping with their heads toward the back wall or toward the cell toilet.

45. On or prior to September 2, 1991, the Prison obtained 25 canvas cots from Emergency Management Services at Indiantown Gap. The cots were designed so that an inmate slept directly on the canvas.

46. The canvas cots obtained were initially set up in the Prison gymnasium to accommodate the expected arrival of male arrestees from the protest at the Hegins Pigeon Shoot.

47. On the evening of September 2, 1991, only six male detainees were housed in the gymnasium.

48. On the evening of September 2, 1991, there were 19 unused canvas cots in the Prison gymnasium.

49. After September 2, 1991, the male arrestees housed in the gymnasium were either moved into cell blocks or released and thereafter no cots were required for the use of male prisoners.

50. After September 2, 1991, the 25 canvas cots were placed in storage at the Prison, and they remained there for the duration of the Plaintiffs' incarceration.

51. None of the canvas cots obtained by the Prison was made available to Plaintiffs.

52. Defendants made no effort to obtain additional canvas cots between September 2 and September 16, 1991.

53. There are no physical limitations that prevented placing canvas cots in the cells or the Day Room of Cell Block A.

54. Warden Kurtz was aware that certain Plaintiffs were sleeping on mattresses on the floor.

55. Deputy Warden Lorent knew that certain Plaintiffs were sleeping on the floor and that canvas cots were in storage at the prison. He did not have the canvas cots taken to Cell Block A because, "no one asked for them."

### Access to Telephones

56. After their hearings before the District Justice on September 2, 1991, at which bail was set, Plaintiffs had no opportunity to use the telephone before being taken to the prison.

57. Upon their arrival at the Prison, the Plaintiffs were placed in "48–hour lock-up." A prisoner in 48–hour lock-up is locked in her cell for 48 hours except for an orientation meeting with a counselor and a medical screening. The 48–hour lock-up is done for the purpose of quarantining inmates for medical reasons and psychological reasons for the protection of the inmate, other inmates, and prison employees.

58. During Plaintiffs' 48–hour lock-up, Defendants Neidig, DeAngelo, Laubach, Medinsky, Schwartz and Shartzer worked in Cell Block A.

59. Pursuant to Prison policy, prisoners in 48–hour lock-up do not have access to the telephone in the cell block.

60. Prisoners in 48–hour lock-up may only use the telephone in the cell block in the case of an emergency and in the discretion of the supervisor. During this time, non-emergency calls are not permitted on the cell block phones.

61. The Rules and Regulations handbook issued to all prisoners, including Plaintiffs, states as follows:

Any individual committed to Schuylkill County Prison will be placed in a 48–hour lock-up status until an orientation is done with him by the counselor, and he is medically screened.

While in this status, prior to his releases (sic) in population, he will be granted only the following:

a. Personal phone call for bail or emergency.

b. Shower afforded every other day.

62. The prisoner's first phone call generally occurs during the prisoner's orientation session with the counselor.

63. The Schuylkill County Prison Rules and Regulations provides:

2. **Telephone**

A. **Admission**—You may make calls for bail and attorney, and family notification when interviewed by Treatment staff. Bail calls prior to this contract may be made with permission of Supervisor. All long distance calls are made "collect".

B. **Regular Status**—Upon release into regular population, you will be eligible for participation in the Inmate Collect Call System available in all dayroom areas. Any abuse of phone or use of abusive language will result in loss of phone privileges. This privilege is revoked automatically if confined for disciplinary infractions. Hours are posted.

C. **Emergency Calls**—Permission for special phone calls must be made by the Supervisor, Deputy Warden or Warden only!! These are for only the most urgent circumstances.

D. **Incoming Calls**—The Prison will not accept phone messages for inmates. Exceptions are made for verifiable emergencies concerning an inmate's family or from a legal agency.

64. Each Plaintiff (other than Lord and Yanne who were released on September 3, 1991) had an orientation session with a Prison counselor during her second day of detention. During their orientation sessions, Plaintiffs Prescott, Walker, Brebner, Gibbs, Woods, and Forbes were permitted to complete one telephone call. In cases where a Plaintiff received a busy signal or no answer, she was permitted to call other numbers until one call was completed. Plaintiffs were given no indication that additional calls would be permitted.

65. In her orientation session, Plaintiff Newkirk made one call to her attorney and was permitted to return a call to a reporter.

66. The prison does not prohibit attorney visits during 48–hour lock-up status. When Plaintiffs were in 48–hour lock-up status in September of 1991, Plaintiff Prescott was permitted to meet with an attorney on one occasion and Plaintiff Newkirk was permitted to meet with an attorney on two occasions.

67. The Defendant corrections officers told Plaintiffs that they could not use the telephone located in the cell block until their 48–hour lock-up status had ended. Plaintiffs made no phone calls during 48–hour lock-up other than those calls permitted during the orientation session.

68. None of the Plaintiffs filed a complaint with prison official regarding use of the telephone.

## III. *DISCUSSION*

Mindful of plaintiffs' allegations and the standard of review under which we must review them, we now turn to the plaintiffs' case.

### *Plaintiffs' Constitutional Rights*

42 U.S.C. § 1983 provides redress only for infringements of rights "secured by the Constitution and laws of the United States." *Davidson v. O'Lone,* 752 F.2d 817, 821 (3d

Cir.1984) (*en banc*), *aff'd sub. nom., Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). A threshold requirement in virtually every § 1983 action is the identification of which constitutional right a plaintiff seeks to vindicate.

The remaining claims in this § 1983 action rely on the First, Fourth, and Fourteenth Amendments. Additionally, in some of plaintiffs' papers, reference is made to the Eighth Amendment. It is beyond dispute, however, that the eighth amendment does not apply to pretrial detainees. *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); *Ingraham v. Wright,* 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 1412 n. 40, 51 L.Ed.2d 711 (1977). Accordingly, if any of plaintiffs' constitutional rights were implicated in this case, they must have arisen under the first, fourth, or fourteenth amendments.

Criteria for evaluating the conditions of a pretrial detainee's confinement were established in *Bell.* In that case, the Supreme Court ruled that a government can, in accordance with due process, incarcerate an individual charged with a criminal offense prior to an adjudication of guilt so long as the conditions of pretrial detention do not amount to punishment of the detainee. *Id.* 441 U.S. at 535, 99 S.Ct. at 1871–72. Where punishment of a detainee is manifest, however, the detainee has been deprived of liberty without due process of law. *Id.*

In deference to valid considerations of prison administration, the *Bell* court acknowledged that "not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Id.* at 537, 99 S.Ct. at 1873. Accordingly, a district court evaluating the constitutionality of the conditions of a person's pretrial confinement "must decide whether [a] disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538, 99 S.Ct. at 1873. "[I]n the absence of a showing of intent to punish,[5] a court must look to see if a particular restriction or condition, which may on its face appear to be

---

5. The plaintiffs have not suggested that defen- dants affirmatively intended to punish them.

punishment, is instead but an incident of a legitimate nonpunitive governmental objective." *Id.* at 539, n. 20, 99 S.Ct. at 1874, n. 20.

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539, 99 S.Ct. at 1874 (citation omitted).

Courts determining whether conditions and restrictions imposed on pretrial detainees are reasonably related to a legitimate government purpose:

> must heed [the Supreme Court's] warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Id.* at 540, n. 23, 99 S.Ct. at 1875, n. 23 (quoting *Pell v. Procunier,* 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974)). Even when limitations on a pretrial detainee's freedom are rationally related to a legitimate nonpunitive governmental purpose, they will amount to punishment if "they appear excessive in relation to that purpose." *Bell,* 441 U.S. at 561, 99 S.Ct. at 1886.

The rights of pretrial detainees announced by the Supreme Court in *Bell* were recognized and applied in the Third Circuit long before the incarceration of these ten female plaintiffs at Schuylkill County Prison. In *Union County Jail Inmates v. Di Buono,* 713 F.2d 984 (3d Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984), the Third Circuit strictly adhered to the teachings of *Bell* when it described the

following procedure for determining whether conditions imposed on a pre-trial detainee amounted to punishment:

> in determining ... whether conditions ... are such as to amount to punishment, which would violate the due process rights of pre-trial detainees, we must ask, first, whether any legitimate purposes are served by these conditions, and, second, whether these conditions are rationally related to these purposes. In assessing whether the conditions are reasonably related to the assigned purposes, we must, further, inquire as to whether these conditions cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purposes assigned for them.

*Id.* at 992 (quotations and citations omitted).

 If a restriction appears to be unrelated to a legitimate governmental objective, and is, for example, arbitrary or purposeless, then a court may infer that it is intended to be punishment. *Bell,* 441 U.S. at 538, 99 S.Ct. at 1874. Legitimate governmental interests include ensuring the detainee's appearance at trial, as well as maintaining security and order at the prison facility. *Id.* at 540, 99 S.Ct. at 1874. However, even if the restrictions were reasonably related to a legitimate purpose, but yet excessive in relation to that purpose, the court may infer an intent to punish. *Id.* at 538, 99 S.Ct. at 1873–74.

We now turn to the particular conditions at issue in this case:

### A. Adequacy of Sleeping Space

 In the remaining outstanding claim in Count I of the plaintiffs' Amended Complaint, plaintiffs charge that defendants, acting under color of state law, forced seven of the plaintiffs both to double-up in cells designed for a single inmate and to sleep on mattresses on the floor of those cells for differing periods of time throughout their incarceration at Schuylkill County Prison.[6]

---

6. Plaintiff Newkirk was forced to sleep thirteen nights on a mattress on the floor of a single occupancy cell; plaintiffs Gibbs and Woods were similarly confined for fourteen nights; plaintiffs Forbes and Yanne slept one night on a mattress on the floor in the common area; plaintiff Walk-

Five of the seven plaintiffs were forced to sleep adjacent to the cell toilets, and although plaintiffs did not stipulate to the exact measurements of the cells, the parties' description leaves us with the impression that it was quite a small area. Stip.Facts, ¶ 44. Moreover, prison officials double-celled [7] these seven plaintiffs even though the Prison had available a supply of canvas cots and had, in fact, set up the cots in the Prison gymnasium with the expectation that a sudden influx of male prisoners might be admitted from the planned protest at the Hegins Pigeon Shoot. Stip.Facts, ¶¶ 45, 46.

Prison officials had a sufficient supply of cots to set up for the newly admitted female inmates but had made no similar arrangement for the women as they had prepared for male inmates. Prison officials agreed that there were no physical limitations preventing them from setting up these cots in the female cell block's Day Room. Stip. Facts, ¶¶ 48, 53.

The Supreme Court has held that "double-bunking" does not constitute a *per se* violation of a pretrial detainee's due process rights. *Bell* 441 U.S. at 541, 99 S.Ct. at 1875. The Court left open the possibility, however, that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment...." *Id.* at 542, 99 S.Ct. at 185-76.

In *Lareau v. Manson,* 651 F.2d 96 (2d Cir.1981), the Second Circuit held that double-bunking of pretrial detainees was constitutionally permissible for a period of no more than fifteen days, but the use of floor mattresses constituted punishment "without regard to the number of days for which a prisoner is so confined." *Id.* at 105. The Third Circuit echoed this sentiment in *Di Buono,* 713 F.2d at 996-97, stating that the

"unsanitary and humiliating" practice of forcing detainees to sleep on mattresses on the floor does not pass constitutional muster. In that case, the Third Circuit concluded that "of all the various conditions challenged as being unconstitutional, the most significant, and indeed the only condition not meeting constitutional standards, was the practice of placing a mattress on the floor for the second occupant of a cell designed for but one inmate." *Id.* at 994. The clear implication of the court's language was that double-celling would only be constitutionally permissible if it were used in exigent circumstances for extremely brief periods of time. With respect to the use of floor mattresses in prisons, *see also Anela v. Wildwood,* 790 F.2d 1063 (3d Cir.1986), *cert. denied,* 479 U.S. 949, 107 S.Ct. 434, 93 L.Ed.2d 384 (1986) (absence of mattresses unconstitutional in light of *Lareau* and *Di Buono, supra,* finding floor mattresses unconstitutional for pretrial detainees); *Lyons v. Powell,* 838 F.2d 28 (1st Cir. 1988) (pretrial detainee's allegation that he was forced to sleep on floor mattress sufficient condition to show deprivation of due process); *Young v. Keohane,* 809 F.Supp. 1185 (M.D.Pa.1992) (overcrowded conditions, including being confined to a room housing eleven inmates and being forced to sleep on cots on the floor, amounted to punishment); *Inmates of Allegheny County Jail v. Wecht,* 565 F.Supp. 1278 (W.D.Pa.1983), *aff'd in rel. part,* 754 F.2d 120 (3d Cir.1985) (totality of conditions at prison resulting from overcrowding, including use of floor mattresses, rose to level of constitutional violation for both pretrial detainees and inmates).

According to the stipulated facts in this case, plaintiffs Newkirk, Gibbs and Woods spent between thirteen and fourteen nights on a mattress on a cell floor, while plaintiffs Walker and Brebner spent between six and eight nights under the same conditions. We feel that the evidence does not rise to the level of a constitutional violation with regard

---

er slept "approximately" six nights on a mattress on the floor of a cell; and plaintiff Brebner was forced to sleep "approximately" eight nights on a mattress on a cell floor. Stip.Facts, ¶ 43.

**7.** We use the term "double-celled" to mean the confinement of two inmates in a single occupan-

cy cell, without providing a second bed. We use the term "double-bunked," however, to mean the confinement of two inmates in a single occupancy cell, with each inmate being provided with a permanent bunk-type bed of her own.

to plaintiffs Yanne and Forbes because they spent only one night on a mattress on a floor and the mattress was not located in a cell. As explained above, the Third Circuit clearly has provided that subjecting pretrial detainees to the use of floor mattresses for anything other than brief emergency circumstances may constitute an impermissible imposition of punishment, thereby violating the due process rights of such detainees. *Di Buono*, 713 F.2d at 994. *See also, Anela, supra.* In the present case, prison officials knew of the possibility of a sudden influx of new prisoners and had attempted to accommodate prisoners adequately, however, these modifications were made only for male prisoners. No attempt was made to modify accommodations for female prisoners even after prison officials became aware that no overcrowding in the male cell block would result from the Hegins protest.

The fact that prison officials prepared cots in the gymnasium to accommodate a sudden influx of male inmates clearly indicates that officials were concerned about double-celling inmates. Despite this concern, prison officials made no adjustments to accommodate the newly admitted female prisoners. Defendants provide the court with no explanation for this failure except that the female prisoners had not "asked for" modified accommodations, such as the use of cots in a larger space like the gymnasium. Stip.Facts, ¶ 55.[8]

Based on the foregoing considerations, we hold that by housing five plaintiffs with other inmates in cells designed for a single person and forcing five plaintiffs to sleep on mattresses on the floors of these cells, defendants violated the rights under the Due Process Clause of the Fourteenth Amendment of these five plaintiffs. We find no such violation with regard to the other plaintiffs Yanne, Forbes, Prescott, and Lord.

**1. *Personal Liability of Warden Kurtz and Deputy Warden Lorent***

■ Plaintiffs have brought claims against defendants Kurtz and Lorent in both their official and individual capacities. Personal capacity suits seek to impose personal liability upon a government official; damages are recoverable from the official's personal assets. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). In order to establish personal liability in a § 1983 action, "it is enough to show that the official, acting under color state of law, caused the deprivation of a federal right." *Id.*, at 166, 105 S.Ct. at 3106, and plaintiffs here have so shown. However, individual defendants are entitled to, and do, raise the defense of qualified immunity.

■ Recently, the Supreme Court has clarified the procedural framework for determining the applicability of this doctrine. In *Hunter v. Bryant*, — U.S. —, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), the Court emphasized that qualified, or "good faith," immunity is a question of law to be decided by the judge, not a question of fact for the jury. In a *per curiam* opinion, the Court stated that "[i]mmunity should be decided by a court long before trial." *Id.* at —, 112 S.Ct. at 537. In an earlier opinion, the Court concluded that questions of immunity should be resolved "at the earliest possible stage of the litigation." *Anderson v. Creighton*, 483 U.S. 635, 646, n. 6, 107 S.Ct. 3034, 3042, n. 6, 97 L.Ed.2d 523 (1987).

In applying the doctrine of qualified immunity to the facts of a given case, a court must grant immunity to a government official performing discretionary functions "insofar as [her] conduct does not violate clearly established statutory or constitutional rights of

**8.** Defendants argued in their Opposition to Plaintiffs' Motion for Summary Judgment that the "evidence does not establish that [the available] cots would be any more comfortable than the use of a standard prison mattress on the floor." *Defendants' Brief in Opposition to Plaintiffs' Motion for Summary Judgment,* 9. This argument fails to respond to the real concerns of the Third Circuit. In *Di Buono,* the Third Circuit pointed to "the unsanitary and humiliating practice of forcing detainees to sleep on mattresses placed either on

the floor adjacent to the toilet and at the feet of their cellmates, or elsewhere in the Jail," *Di Buono,* 713 F.2d at 996, as its justification for raising this condition to the level of punishment for purposes of due process analysis. The fact that the mattresses provided by prison officials may have been more comfortable than the use of canvas cots is not responsive to the concerns that sleeping on the floor in a cell designed for one person but housing two is "unsanitary and humiliating." *Id.*

which a reasonable person would have known." *Brooks v. Andolina,* 826 F.2d 1266, 1268 (3d Cir.1987) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In some cases, the qualified immunity issue also has rested on "the complementary question of whether defendant had a clearly established duty towards plaintiff." *Ryan v. Burlington County,* 860 F.2d 1199, 1205 (3d Cir.1988), *cert. denied, Fauver v. Ryan,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989).

To determine whether the right allegedly violated was clearly established when the challenged conduct took place, the United States Court of Appeals for the Third Circuit has endorsed the following guidelines:

> [T]he standard to which we look ... states that the contours of that right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This does not mean, however, that an official will be protected from suit unless the very action in question has previously been held unlawful; rather, the unlawfulness must be apparent in light of existing law.

*Id.* at 1208 (citations and quotations omitted). The official's state of mind is generally not a factor in determining whether immunity is available.[9] *Harlow,* 457 U.S. at 815–17, 102 S.Ct. at 2736–38. Instead, the immunity question is resolved by examining the *objective* reasonableness of the defendant's conduct in light of clearly established federal law. *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986); *Schrob v. Catterson,* 948 F.2d 1402, 1421 (3d Cir.1991); *Brown v. Grabowski,* 922 F.2d 1097, 1109 (3d Cir.1990), *cert. denied, Roselle v. Brown,* —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991). Consequently, "arguments that the defendants desired to handle or subjectively believed that they had handled the incidents properly are irrelevant." *Stoneking v. Bradford Area School Dist.,* 882 F.2d 720, 726 (3d Cir.1989), *vacated on other grounds sub nomine Smith v. Stoneking,* 489

U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989).

Applying these standards to the facts in this case, we feel it is clear that the defendants Kurtz and Lorent are not protected by qualified immunity with regard to the double-celling claims of the five plaintiffs. In resolving this question in plaintiffs' favor, the court finds Warden Kurtz and Deputy Warden Lorent should have known conduct similar to that which indisputably occurred in this instance had been declared unconstitutional in cases employing well-reasoned *Bell* analyses like *Di Buono* and *Anela* in our own Third Circuit and *Lareau* and *Powell* in other Courts of Appeal. "Although officials need not 'predict the future course of constitutional law,' they are required to relate established law to analogous factual settings." *People of Three Mile Island ex rel. Three Mile Island Alert, Inc. v. Nuclear Regulatory Commrs.,* 747 F.2d 139, 144 (3d Cir.1984) (citations omitted). On this record, the contours of plaintiffs' rights were clear.

We hold, therefore, that the law prohibiting the doubling-up of pretrial detainees in a cell designed for one inmate and forcing detainees to sleep on mattresses on cell floors for a period greater than a few days was clearly established in September 1991 when this activity took place. As the Supreme Court noted in *Harlow,* "a reasonably competent public official should know the law governing his conduct." 457 U.S. at 819, 102 S.Ct. at 2738. Thus, we grant summary judgment for the plaintiffs against the individual defendants Warden Kurtz and Deputy Warden Lorent for double-celling plaintiffs as such conduct was stipulated in this case.

We will grant summary judgment in favor of all other defendants named in the plaintiffs' Amended Complaint on this issue since no allegations were specifically brought against them by plaintiffs.

**2. *Liability of Schuylkill County***

■ The plaintiffs also seek to hold both Warden Kurtz and Deputy Warden Lorent

---

**9.** *Harlow* marked a significant shift from the prior two part test of *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), which required a subjective analysis of the defendants' motivations.

liable in their official capacities [10] for forcing plaintiffs to sleep on mattresses on cell floors. To the extent the plaintiffs are suing these two defendants in their official capacities, their claims against Kurtz and Lorent are the equivalent of claims brought against the County itself. *Will,* 491 U.S. at 71, 109 S.Ct. at 2311.

The Supreme Court in *Monell v. Department of Social Servs.,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 2036–38, 56 L.Ed.2d 611 (1978), established that a § 1983 complaint against a municipality must allege first, the existence of a custom or policy of the municipality which is of such long standing as to have the force and effect of law; and second, that one or more of the municipality's employees violated an individual's civil rights while acting pursuant to this custom or policy. The *Monell* Court overruled the decision in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), in which municipalities were held not to be "persons" subject to suit under the meaning of the terms in § 1983.

The Supreme Court held in *Monell* that when a municipal policy of some nature is the cause of certain unconstitutional actions taken by municipal employees, the municipality itself will be held liable. Liability was found to exist where the unconstitutional action implements or executes a policy, statement, ordinance, regulation, or decision officially adopted and promulgated custom even though such a custom has not received formal approval. The *Monell* Court defined "custom" as the "persistent and widespread discriminatory practice of state officials," *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036. A policy or custom does not need to be made by respective lawmakers, but can be created by "those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694, 98 S.Ct. at 2037.

In *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court reaffirmed the proposition that municipal liability may be imposed for a single decision by municipal lawmakers. The Court in *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) further defined the "policy" criteria of *Monell.* The Court's decision in *Praprotnik* refines the criteria under which § 1983 liability will be found against municipalities. The Court, in a plurality decision, held that a municipality will only be judged liable under § 1983 if the final policymaker is the individual who takes the unconstitutional action.

Although the *Praprotnik* Court further established the "final policymaker" standard, it also carved out two "exceptions" where municipal liability could be found even if the action is taken by an individual other than the final policymaker. First, the Court suggested that "whatever analysis is used to identify municipal policymakers, egregious attempts by local government to insulate themselves from liability for unconstitutional policies are precluded by a separate doctrine ... the most deliberate municipal evasions of the Constitution will be sharply limited." *Praprotnik,* 485 U.S. at 125–27, 108 S.Ct. at 925–26 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)). Second, the Court proposed that "when a subordinate's decision is subject to review by the municipality's authorized policymakers ... and the authorized policymakers approve a subordinate's decision and the basis for it, their ratification [will] be chargeable to the municipality...." *Id.,* 485 U.S. at 127, 108 S.Ct. at 926. The *Praprotnik* Court added the expressed requirement that municipal liability can attach only where the challenged actions are those of municipal officers "who have 'final policymaking authority'." *Id.,* 485 U.S. at 123, 108 S.Ct. at 924 (quoting from *Pembaur,* 475 U.S. at 480, 106 S.Ct. at 1298). In other words, only those municipal officers and employees who have final policymaking authority can by their actions subject their municipal employers to § 1983 liability. *Id.*

Plaintiffs' attempt to state a basis for Schuylkill County's liability under the latter theory on the premise that Warden Kurtz

---

**10.** States are protected against such suits by the Eleventh Amendment to the United States Constitution while political subdivisions of the state such as municipalities are not protected. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

and Deputy Warden Lorent[11] were "the highest policy-making official[s] for the act in question." *Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment,* 21. The Supreme Court in *Pembaur* did hold that a county prosecutor's single decision, taken as an official policymaker, made the county liable. *Pembaur,* 475 U.S. at 469, 106 S.Ct. at 1292. In *Praprotnik,* however, the Supreme Court made it clear that "the authority to make municipal policy is necessarily the authority to make *final* policy." 485 U.S. at 127, 108 S.Ct. at 926. There can be no *de facto* final policymaking authority. *Id.* at 131, 108 S.Ct. at 928.

The Supreme Court instructed us further in *Pembaur* that "whether an official had final policymaking authority is a question of state law." 475 U.S. at 483, 106 S.Ct. at 1300. We believe that Warden Kurtz and Deputy Warden Lorent do not possess final policymaking authority under state law, even if sometimes their decisions are final in practice. *Plunto v. Wallenstein,* 1989 WL 95390, at *3, 1989 U.S.Dist. LEXIS 9579, *7 (E.D.Pa.1989) (holding that decision of Bucks County Prison Board in Pennsylvania is final for purposes of § 1983 action and is needed to ratify Warden's decision to hold County liable). Schuylkill County employs both County Commissioners and a County Prison Board as official policymaking bodies within the County. Stip.Facts, ¶¶ 4, 5. The existence of these bodies as overseers of the County prison system undermines the contention that the power to make final policy can be removed from them. *Id.* Moreover, no evidence has been offered under the facts of this case that the County Prison Board or County Commissioners had knowledge of the double-celling of plaintiffs and had either ratified or deferred to this practice. Following the instruction of *Pembaur* and *Praprotnik,* therefore, this Court finds that Warden Kurtz and Deputy Warden Lorent were not "final policymaking authorit[ies]" acting on behalf of the Schuylkill County Prison Board or County Commissioners.

■ The plaintiffs also put forward the argument that defendants' Kurtz and Lorent acted with "deliberate indifference" to the constitutional rights of plaintiffs. *Plaintiffs' Memorandum of Law in Support of Motion of Summary Judgment,* 21–22. Their argument is based on the Supreme Court's ruling in *Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), which held that a municipality's failure to train its police officers can give rise to a constitutional violation only when that failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.,* 489 U.S. at 388, 109 S.Ct. at 1204.

The plaintiffs' reliance on this standard, however, is misplaced in this case. The *Canton* standard expanded upon the Court's ruling in *Monell,* in which the Court conditioned the direct liability of a local governmental entity under § 1983. *Monell's* holding suggests that plaintiffs, as an element of establishing the County's policy or custom of deliberate indifference, must have presented evidence of such indifference on the part of lawmakers or other officials with the authority to make municipal policy. As we determined above, acts by Warden Kurtz and Deputy Warden Lorent cannot "fairly be said to represent official policy." *Monell,* 436 U.S. at 691, 98 S.Ct. at 2037. Moreover, plaintiffs have failed to introduce any evidence showing that the Warden and Deputy Warden's actions are indicative of "persistent and widespread discriminatory practice" within the County. *Id.,* at 694, 98 S.Ct. at 2037. Therefore, plaintiffs have not met their burden of establishing the County's policy or custom of deliberate indifference to plaintiffs' constitutional rights.

We will deny the plaintiffs' motion with regard to the claim against defendants' Kurtz and Lorent in their official capacities, and also against Schuylkill County, on this issue.[12]

---

**11.** Deputy Warden Lorent served as acting Warden during a portion of the incarceration period of the plaintiffs. Stip.Facts, ¶ 7.

**12.** As discussed above, § 1983 also refers to deprivations under color of a state "custom or usage," and the Court in *Monell* noted accordingly that "local governments, like every other § 1983 'person,' ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's

## B. Blanket Strip and Body Cavity Searches

In Counts V and VI of their Amended Complaint, all nine plaintiffs challenge their forced submission to strip and visual body cavity searches at Schuylkill County Prison. Stip.Facts, ¶ 20. They contend that Schuylkill County Prison procedures constitute unlawful searches in violation of the Fourth Amendment and also that the searches conducted by Officers Neidig and DeAngelo violated plaintiffs' rights to due process of law guaranteed by the Fourteenth Amendment.

The County concedes that as a matter of County policy, all new admittees to the County prison must undergo strip and visual body cavity searches. Stip.Facts, ¶ 23. The defendants argue that the searches conducted in this case did not violate plaintiffs' due process and fourth amendment rights because prison officials acted in response to legitimate governmental concerns and were careful to perform the searches in the least intrusive manner to the privacy interests of the detainees.

In recognition of the principle that pretrial detainees retain their Fourth Amendment rights within the prison walls, the Supreme Court has held that searches of pretrial detainees in prison must be reasonable within the meaning of the Fourth Amendment. *Bell, supra.* To evaluate the reasonableness of the search challenged in *Bell,* the Court employed a balancing test which has now become a centerpiece of Fourth Amendment analysis in the prison context:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* 441 U.S. at 559, 99 S.Ct. at 1884. *See Chapman v. Nichols,* 989 F.2d 393 (10th Cir.1993) (*Bell* standard employed in deciding validity of automatic strip search policy as applied to arrestees for traffic violations); *Fuller v. M.G. Jewelry,* 950 F.2d 1437 (9th Cir.1991) (*Bell* reasonableness standard applied to determine constitutionality of policy requiring visual body cavity searches of all felony arrestees); *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986) (*Bell* test applicable in case challenging constitutionality of automatic strip and body cavity searches of arrestees charged with misdemeanors or other minor offenses), *cert. denied,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); *DiLoreto v. Oaklyn,* 744 F.Supp. 610 (D.N.J.1990) (*Bell* standard used to analyze constitutionality of officer's visual inspection of detainee's bathroom use); *Deborah El v. Williams,* 1990 WL 65717, 1990 U.S.Dist. LEXIS 6045 (E.D.Pa. May 15, 1990) (*Bell* test determined appropriate standard governing prison searches).[13]

We agree with the defendants' and the Ninth Circuit in their assertion that "the prevention of the introduction of weapons or other contraband into the prison [ ] is indeed an extremely weighty government interest." *Thompson v. Los Angeles,* 885 F.2d 1439, 1446 (9th Cir.1989); *see also Bell,* 441 U.S. at 559, 99 S.Ct. at 1884–85 (prevention of smuggling of money, drugs, weapons, and other contraband is significant and legitimate pris-

---

official decisionmaking channels." 436 U.S. at 690–91, 98 S.Ct. at 2035–36. A § 1983 plaintiff thus may be able to recover from a municipality without adducing evidence of an affirmative decision by policymakers if able to prove that the challenged action was pursuant to a state "custom or usage." Because there is no allegation that the action challenged here was pursuant to a local "custom," this aspect of *Monell* is not at issue in this case.

13. We note that like the case before this court, the Supreme Court's analysis in *Bell* was applied specifically to prison practices and policies di-

rected at pretrial detainees. Although the Supreme Court has not ruled on the issue of routine strip/body cavity searches of convicted prisoners, other circuits have applied the *Bell* analysis to such searches and found them constitutional. *See e.g., Goff v. Nix,* 803 F.2d 358, 370–71 (8th Cir.1986), *cert. denied,* 484 U.S. 835, 108 S.Ct. 115, 98 L.Ed.2d 73 (1987); *Campbell v. Miller,* 787 F.2d 217, 228 (7th Cir.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986); *Arruda v. Fair,* 710 F.2d 886, 888 (1st Cir.), *cert. denied,* 464 U.S. 999, 104 S.Ct. 502; 78 L.Ed.2d 693 (1983).

on security interest). On the other hand, the privacy interest at stake in a strip search, especially one including visual inspection of body cavities, cannot be understated.[14]

The feelings of humiliation and degradation associated with being forced to expose one's nude body to strangers for visual inspection is beyond dispute. *See Mary Beth G. v. Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (finding few exercises of state authority that intrude on citizens' privacy and dignity as severely as visual anal and genital searches).

In weighing these same competing governmental and private interests, no less than eight United States Courts of Appeals have invalidated blanket strip search policies under similar circumstances. *See Fuller, supra; Masters v. Crouch*, 872 F.2d 1248 (6th Cir.1989), *cert. denied, Frey v. Masters*, 493 U.S. 977, 110 S.Ct. 503, 107 L.Ed.2d 506 (1989); *Walsh v. Franco*, 849 F.2d 66 (2d Cir.1988); *Jones v. Edwards*, 770 F.2d 739 (8th Cir.1985); *Stewart v. Lubbock County*, 767 F.2d 153 (5th Cir.1985), *cert. denied*, 475 U.S. 1066, 106 S.Ct. 1378, 89 L.Ed.2d 604 (1986); *Hill v. Bogans*, 735 F.2d 391 (10th Cir.1984); *Mary Beth G., supra; Logan v. Shealy*, 660 F.2d 1007 (4th Cir.1981), *cert. denied, Clements v. Logan*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982).[15] We look to other Courts of Appeals for guidance on this issue since our own Third Circuit has not spoken directly on the issue.[16]

In each of the above cases, the task was, as prescribed in *Bell*, to balance the governmental interest in maintaining safe detention facilities against the privacy rights of the detainee to be free from a most humiliating and degrading experience. The eight Courts of Appeal that have invalidated strip search policies as applied to nonviolent misdemeanor offenders have generally held that in order to strip search such detainees, the arresting officers must have reasonable individualized suspicion that a detainee is carrying or concealing contraband. *See e.g., Fuller*, 950 F.2d at 1446; *Walsh*, 849 F.2d at 69; *Mary Beth G.*, 723 F.2d at 1273. Individualized suspicion sufficient to warrant a strip search of such detainees may be based on such factors as the nature of the offense, the arrestee's appearance and conduct, and any prior arrest record. *Fuller*, 950 F.2d at 1446.

The Sixth Circuit has, in contrast, upheld the strip search of a detainee charged with the misdemeanor offense of menacing, *Dobrowolskyj v. Jefferson County*, 823 F.2d 955, 957–59 (6th Cir.1987), *cert. denied*, 484 U.S. 1059, 108 S.Ct. 1012, 98 L.Ed.2d 978 (1988), and felonious assault, *Dufrin v. Spreen*, 712 F.2d 1084, 1089 (6th Cir.1983), based primarily on the fact that the charged offenses were sufficiently associated with violence and contraband and that the detainees would be intermingled with the general prison population. *See also Masters*, 872 F.2d at 1255 ("It is objectively reasonable to conduct a strip search of one charged with a crime of violence before that person comes into contact with other inmates.").

Although plaintiffs, like the detainees in *Dobrowolskyj* and *Dufrin*, were placed into contact with the general prison population, such a factor by itself cannot justify a strip search. *See Masters*, 872 F.2d at 1254–55 ("the fact of intermingling alone has never been found to justify [a strip search] without consideration of the nature of the offense and the question of whether there is any reason-

---

**14.** Plaintiff Prescott was ordered during the visual body cavity search to remove her tampon for the inspecting officer. Stip.Facts, ¶ 36. Defendants admit that the removal of tampons and sanitary napkins are part of the County's policy for maintaining prison security. *Defendants' Brief in Support of Motion for Summary Judgment*, 19.

**15.** The facts of many of these opinions involve strip and body cavity searches of arrestees charged with misdemeanors or other minor offenses. *See especially, Fuller*, 950 F.2d at 1446 (strip search unconstitutional after arrest for grand theft). *See also Mary Beth G.*, 723 F.2d at 1272 (strip search unconstitutional after arrest for traffic offenses and other nonviolent misdemeanors).

**16.** District courts within the Third Circuit, however, have held blanket strip search policies unconstitutional. *See Ernst v. Ft. Lee*, 739 F.Supp. 220 (D.N.J.1990) (strip search policy unconstitutional on traffic offender); *O'Brien v. Woodbury Heights*, 679 F.Supp. 429 (D.N.J.1988) (strip search unconstitutional after arrest for disorderly conduct).

able basis for concern that the particular detainee will attempt to introduce weapons or other contraband into the institution"); *Giles v. Ackerman,* 746 F.2d 614, 618 (9th Cir.1984), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985) (fact that detainee may ultimately be intermingled with general prison population does not, by itself, justify strip search as such intermingling is "both limited and avoidable"). Thus, the reasonableness determination in this case hinges upon the nature and circumstances surrounding the particular offense with which plaintiffs were charged.

In this case, plaintiffs were charged with criminal trespass which can be punished in the Commonwealth of Pennsylvania as a misdemeanor or as a summary offense. 18 Pa. C.S.A. §§ 1104 and 1105 (1983). In either case, a conviction could have resulted in imprisonment. *Id.* More specifically, plaintiffs entered prison as part of an orderly mass protest against the mistreatment of pigeons during the Hegins annual pigeon shoot. Stip.Facts, ¶¶ 1, 2. The record gives no indication that plaintiffs reacted violently against anyone at the pigeon shoot or to law enforcement officials upon arrest.

Defendants provide no evidence to support a belief that these plaintiffs were dangerous or threatening to the security of the prison. In fact, they stipulated that the strip searches of plaintiffs "were not based upon any specific suspicion that any of the plaintiffs was concealing weapons, drugs, or other contraband." Stip.Facts, ¶ 28. Defendants, instead, defend the strip searches on the grounds of maintaining prison security from the dangers of arrestees "who commit actions intending or expecting to go to prison." *Defendants' Brief in Support of Motion for Summary Judgment,* 18. Their allegation, however, was a general one that did not reflect upon the particular circumstances and

nature of the offense of this case. There are no specific allegations in the record suggesting that the arresting officers had suspected these animal rights activists to be harboring weapons or concealing contraband or drugs at the time they were subjected to the strip searches.

Defendants also claim that the strip searches in this case were conducted in a professional manner as required by *Bell,* 441 U.S. at 560, 99 S.Ct. at 1885. That the search of plaintiffs were performed in a reasonable manner and in the presence of a person of the same sex does not affect the complete absence of reasonable suspicion to believe any contraband or weapons would be found on these plaintiffs. *See Jones v. Bowman,* 694 F.Supp. 538, 546 (N.D.Ind.1988).

Although a prison may be a place "fraught with serious security dangers," *Bell,* 441 U.S. at 559, 99 S.Ct. at 1884, the stipulated facts in this case do not support the view that these dangers are created by women minor offenders entering the prison for short periods. Here, the "need for a *particular* search," *id.* (emphasis in original)—a strip search—is hardly substantial enough, in light of the facts presented and the circumstances surrounding the plaintiffs' arrest, to justify the severity of the governmental intrusion.[17]

While the need to ensure prison security is a legitimate and substantial concern, we believe that, on the facts here, the strip searches bore an insubstantial relationship to security needs so that, when balanced against plaintiffs' privacy interests, the searches cannot be deemed "reasonable." *Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981), *cert. denied,* 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). The reasonableness standard requires, "at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an

---

**17.** The parties have stipulated that prior to the plaintiffs' arrest, "inmates had attempted to smuggle contraband into the Schuylkill County Prison in body cavities on several occasions." Stip.Facts, ¶ 32. This fact standing alone, however, does not permit prison officials to strip search all arrestees when the search is not supported by particularized reasonable suspicion. *Mary Beth G.,* 723 F.2d at 1272–73 (affidavits of lockup personnel suggesting a few items had

been recovered in the past from the body cavities of minor offenders are insufficient to support blanket strip search policy). Moreover, the general fact that "inmates," as opposed to pretrial detainees at issue in this case, had been caught smuggling contraband in body cavities "on several occasions" in the County prison does not give rise to a reasonable belief that the women arrestees here were concealing any items in body cavities.

objective standard,' whether this be probable cause or a less stringent test." *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (footnotes omitted). The more intrusive the search, the closer governmental authorities must come to demonstrating probable cause for believing that the search will uncover the objects for which the search is being conducted. *Terry v. Ohio*, 392 U.S. 1, 18 n. 15, 88 S.Ct. 1868, 1878 n. 15, 20 L.Ed.2d 889 (1968). Based on these principles, and a balancing of the factors in *Bell*, we are compelled to find that ensuring the security needs of the Schuylkill County Prison by strip searching plaintiffs was unreasonable without a particularized suspicion by the authorities that either of the twin dangers of concealing weapons or contraband existed.

We therefore hold that plaintiffs' constitutional rights were violated when they were strip searched at the Schuylkill County Prison.

### 1. *Personal Liability of Defendants Kurtz, Neidig, and DeAngelo*

■■■ We turn again to the issue of whether individual defendants are protected by qualified immunity. We have determined above that whether an official may prevail in a qualified immunity defense depends upon the "objective reasonableness of [her] conduct as measured by reference to clearly established law." *Harlow*, 457 U.S. at 800, 102 S.Ct. at 2727.

The qualified immunity defense is not available to individual defendants here because the law concerning the unconstitutionality of blanket strip searches without particularized reasonable suspicion was so clearly established by September 1991 that no reasonable officer could have believed that defendants' conduct was constitutional.

The Supreme Court refined its clearly established law standard in *Anderson v. Creighton:*

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.

*Supra*, 483 U.S. at 639, 107 S.Ct. at 3038. The Supreme Court in *Anderson* went on to explain:

> our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Id.* 483 U.S. at 640, 107 S.Ct. at 3039.

Courts within the Third Circuit have debated the issue as to when the law prohibiting blanket strip/body cavity searches of inmates was clearly established according to the above standards. In *Davis v. Camden*, 657 F.Supp. 396 (D.N.J.1987), where the events took place in May 1984, the court held that the law at issue "was not, in May 1984, so clearly unconstitutional that the defendants reasonably should have known that they were obligated not to implement it." 657 F.Supp. at 401–02. The court in that case noted the "relatively recent vintage of most strip search cases," *id.*, and the fact that the Third Circuit Court of Appeals had not yet ruled on the constitutionality of blanket strip search policies. *Id.* By contrast, in *O'Brien, supra;* the defendants "had a minimum of eighteen months more than the defendants in *Davis* to inform themselves of the prevailing case law outlawing the searches in question." *Id.* at 435. By the time the conduct in this case took place, eight U.S. Courts of Appeal had ruled blanket strip search policies unconstitutional in addition to the aforementioned district courts within the Third Circuit. *See also, DiLoreto v. Oaklyn, supra.*

In *Anderson*, the Supreme Court interpreted earlier cases to mean that it is unnecessary for a particular act previously to have been ruled unlawful: "This is not to say that an official action is protected by qualified immunity unless the very action in question

has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Id.* 483 U.S. at 640, 107 S.Ct. at 3039. The Third Circuit has found that *"Anderson* thus supports our precedent interpreting the 'clearly established' standard as 'requiring some but not precise factual correspondence [between the relevant precedents and the conduct at issue] and demanding that officials apply general well developed legal principles.' " *Stoneking v. Bradford Area School Dist., supra* (citing *People of Three Mile Island ex rel. Three Mile Island Alert, Inc. v. Nuclear Regulatory Commrs.,* 747 F.2d 139, 144 (3d Cir.1984)), *vacated on other grounds sub nomine Smith v. Stoneking,* 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989). *See also Ryan v. Burlington Cty.,* 708 F.Supp. 623, 628 (D.N.J.), *aff'd,* 889 F.2d 1286 (3d Cir. 1989).

In the wake of several district court decisions within the Third Circuit as well as decisions by *eight* United States Courts of Appeal, we hold that the law was clearly established in September 1991 such that reasonable officials would have realized that blanket strip searches, as were conducted here, were unconstitutional. Qualified immunity is not available as a defense based on the stipulated facts in this case.

This court, therefore, finds that defendants Kurtz, Neidig, and DeAngelo are liable for unreasonable strip searches conducted against plaintiffs.

### 2. *Liability of Schuylkill County*

The plaintiffs also seek to hold Warden Kurtz and the current members of the Schuylkill County Prison Board[18] liable in their official capacities for adopting and executing blanket strip/body cavity searches of pretrial detainees. Referring back to our earlier discussion on the issue of official capacity liability, we again note that claims against defendants in their official capacities are the equivalent of claims against the County itself. *Will, supra.*

18. The current Schuylkill County Prison Board consists of defendants: Shields, Holden, Kerns,

■■■ It is beyond doubt that the officially adopted policy of Schuylkill County requiring all individuals admitted to Schuylkill County Prison, including pretrial detainees, undergo strip and visual body cavity searches, does not pass constitutional muster to the extent that the policy permits the indiscriminate strip search of a detainee without requiring a particularized reasonable suspicion that the detainee is concealing a weapon or harboring contraband or drugs.

As mentioned previously, the Supreme Court in *Monell* has instructed us that:

> Local governing bodies [ ] can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decisions officially adopted and promulgated by that body's officers.

*Monell,* 436 U.S. at 690, 98 S.Ct. at 2035. We therefore hold Schuylkill County liable under § 1983 for promulgating and implementing the strip search policy at issue here.

### C. *Restrictions on Telephone Use*

■■■ All nine plaintiffs allege that Schuylkill County Prison policy denied them reasonable access to the use of telephones during the first 48–hour period of their detention. Plaintiffs claim that this policy violated their First and Fourteenth Amendment rights. As discussed in an earlier section of this decision, the *Bell* court has recognized that since a pretrial detainee may not be punished prior to an adjudication of guilt in accordance with law, *see Bell,* 441 U.S. at 535, 99 S.Ct. at 1872, a court faced with a due process challenge to a particular regulation must determine whether the policy is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. *Id.* at 538, 99 S.Ct. at 1873. The Court pronounced that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without [a showing of intent to punish on

and McCloskey.

the part of prison or other government officials] amount to 'punishment'." *Id.* at 539, 99 S.Ct. at 1874.

While many courts have concluded that detainees are entitled to communicate by telephone, the courts do not agree on the minimum level of access required for constitutional purposes.[19] Case law suggests that so long as there is not an outright policy that prohibits telephone use by pretrial detainees, any restriction or limitations that serve a legitimate governmental purpose, and are not punitive, are constitutional under the Due Process Clause. *See e.g., Feeley,* 570 F.2d at 373. At the same time, the courts recognize that all inmates should be granted "reasonable and equitable access to the telephones." *Wooden,* 637 F.Supp. at 546.

Here, plaintiffs were not permitted to make any phone calls, except for bail calls with permission of the supervisor and cases of emergency, before their interview with a prison counsellor, which was to be scheduled sometime during, or immediately after, the first 48–hour period of their detention (the "lockdown period") Stip.Facts, ¶ 59. Defendants allege that this restriction is necessary during the lockdown period in the interests of security. The prison uses this initial 48–hour period for the purpose of quarantining inmates to allow time for medical screening and to schedule interviews with prison counsellors. After the initial lockdown period, the prison imposed no restrictions on the use of the telephones during general population time. Stip.Facts, ¶ 63. Moreover, in this case, each plaintiff, who did not post bail, had a counselling session on the day after their

arrest and actually made at least one phone call at this time.[20] Stip.Facts, ¶ 64.

Pursuant to these findings, we believe that the procedures taken by the County in this case were reasonable responses to legitimate prison concerns. In the absence of any evidence suggesting that the County had adopted its telephone policy with an intent to punish pretrial detainees, we must hold that there was no constitutional violation against the plaintiffs on this issue.

## IV. *CONCLUSION*

For the reasons outlined in the foregoing memorandum, the court will grant the summary judgment motion of the five plaintiffs Newkirk, Gibbs, Woods, Walker, and Brebner, against defendants Kurtz and Lorent in their individual capacity for the unconstitutional action of double-celling plaintiffs and forcing them to sleep on mattresses on cell floors as set forth in Count I. We will grant defendants' summary judgment motion on behalf of defendants Kurtz and Lorent with regard to the claims of the remaining plaintiffs, Yanne, Lord, Prescott, and Forbes, as set forth in Count I. We also grant summary judgment on this same claim in favor of all named defendants, other than defendants Kurtz and Lorent, with regard to all nine plaintiffs. Additionally, we grant defendants' motion for summary judgment with regard to this issue as to all nine plaintiffs' claims against defendants in their official capacities and also as against Schuylkill County.

We grant summary judgment for all nine plaintiffs with regard to the claims in Counts V and VI against defendants Kurtz, Shields, Holden, Kerns and McCloskey, in their offi-

19. As explained in *Wooden v. Norris,* 637 F.Supp. 543, 555 (M.D.Tenn.1986):

A number of courts have stated that prison officials are required to provide inmates with at least some access to telephonic communication. *See, Feeley v. Sampson,* 570 F.2d 364, 373 (1st Cir.1978); *Dawson v. Kendrick,* 527 F.Supp. 1252, 1276, 1314 (S.D.W.Va.1981). Other courts have recognized this right and have specified a certain level of telephone service to be provided [especially in the case of pretrial detainees]: *See e.g., Mitchell v. Untreiner,* 421 F.Supp. 886 (N.D.Fla.1976) (detainees must be allowed to make local calls daily during stated hours). However, several courts have found that particular restrictions

on inmate telephone use were reasonable in light of other means of access to the courts provided by the prison administration, or in light of the legitimate interests of prison officials in administration of the prison. *See Lock v. Jenkins,* 464 F.Supp. 541, 551 (N.D.Ind. 1978), *rev'd on other grounds,* 641 F.2d 488 (7th Cir.1981) (restricting detainee to one collect call per week to attorney and immediate family, not unconstitutional in light of security concerns of prison officials).

20. Plaintiff Newkirk made two phone calls during her interview session with a prison counsellor. Stip.Facts, ¶ 65.

cial capacities and against Schuylkill County for the unconstitutional strip and body cavity searches. We also grant summary judgment for all nine plaintiffs against defendants Kurtz, Neidig and DeAngelo in their individual capacities for the strip and body search claims. We grant summary judgment in favor of defendants Shields, Holden, Kerns, and McCloskey, and against all nine plaintiffs for claims in Counts V and VI against these four defendants in their individual capacities. We grant summary judgment in favor of defendants Neidig and DeAngelo, and against all nine plaintiffs for claims in Counts V and VI against these two defendants in their official capacities. We grant defendants' motion for summary judgment in favor of all named defendants other than Kurtz, Shields, Holden, Kerns, McCloskey, Neidig, DeAngelo and Schuylkill County against all nine plaintiffs with regard to the claims in Counts V and VI.

Finally, the court grants the motion of all defendants for summary judgment with regard to all claims in Count III surrounding the restricted use of telephones during the prison's required 48–hour lockdown period. The court, therefore, also denies plaintiffs' summary judgment motion on this issue.

We note that there has been no demand for a jury trial and if the parties wish to present any additional evidence, a non-jury trial or hearing will be scheduled to award further appropriate relief. An appropriate order follows.

### ORDER

AND NOW, this 16th day of September, 1993, it is ORDERED that the plaintiffs' Motion For Summary Judgment, filed on August 3, 1993, and the defendants' Motion for Summary Judgment filed on August 3, 1993 are each granted in part and denied in part consistent with the foregoing opinion. Accordingly, the court orders, ascertains, and specifies as follows:

1. Plaintiffs' Motion for Summary Judgment is GRANTED in favor of the five plaintiffs Newkirk, Walker, Brebner, Gibbs, and Woods, against defendants Kurtz and Lorent in their individual capacities as to the claim in Count I relating to plaintiffs being forced to sleep on mattresses on cell floors. Defendants' Motion for Summary Judgment is specifically DENIED with regard to these plaintiffs and these defendants in their individual capacities on the claim in Count I relating to plaintiffs being forced to sleep on mattresses on cell floors.

2. Plaintiffs' Motion for Summary Judgment is GRANTED in favor of all nine named plaintiffs and against defendants Kurtz, Shields, Holden, Kerns, and McCloskey in their official capacities and against Schuylkill County as to the claims in Counts V and VI relating to plaintiffs' strip and body cavity searches. Defendants' Motion for Summary Judgment is specifically DENIED with regard to all nine plaintiffs and these individual defendants in their official capacities and Schuylkill County on the claims concerning strip and body searches in Counts V and VI.

3. Plaintiffs' Motion for Summary Judgment is GRANTED in favor of all nine named plaintiffs and against defendants Kurtz, Neidig, and DeAngelo in their individual capacities as to the claim in Counts V and VI relating to plaintiffs' strip and body cavity searches. Defendants' Motion for Summary Judgment is specifically DENIED with regard to all nine plaintiffs and these defendants in their individual capacities on the claims concerning strip and body searches in Counts V and VI.

4. Plaintiffs' Motion for Summary Judgment is DENIED in all other respects.

5. To the extent that we have not specifically denied defendants' Motion for Summary Judgment in paragraphs 1, 2 and 3, said motion is GRANTED as set forth in the conclusion of the foregoing opinion.

6. If the parties wish to present any additional evidence, a non-jury trial or hearing shall be scheduled by the Deputy Clerk to determine further appropriate relief and enter final judgment.